## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SHERHONDA GOLDEN,

*Individually and on behalf of all others similarly situated,*

      *Plaintiff,*

v.

NBCUNIVERSAL MEDIA, LLC,

      *Defendant.*

Case No: 1:22-cv-9858-PAE

Hon. Paul A. Engelmayer

**JURY TRIAL REQUESTED**

## <u>FOURTH AMENDED CLASS ACTION COMPLAINT</u>

Pursuant to the Court's Order dated April 17, 2025, Dkt. No 55, Plaintiff Sherhonda Golden, individually and on behalf of all others similarly situated, respectfully submits this Fourth Amended Class Action Complaint against Defendant NBCUniversal Media, LLC ("Defendant") for violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA").

Plaintiff's claims arise from Defendant's practice of knowingly disclosing to a third party, Meta Platforms, Inc. (owner of Facebook and Instagram, as well as other applications), data containing Plaintiff's and other digital-subscriber Class Members' (i) personally identifiable information or Facebook ID ("FID") and (ii) the computer file containing video and its corresponding URL of the pre-recorded video viewed ("Video Media") (collectively, "Personal Viewing Information"). In other words, this transmission of personally identifiable information to Facebook is achieved through a "pixel" that Facebook programs, entirely controls, and determines what video viewing information is transmitted, when it is transmitted, and the form in which it is transmitted so it can be linked to the individual user by Facebook and then capitalized on by Defendant. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's

1

own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.    This is a consumer digital privacy class action complaint against NBCUniversal Media, LLC, as the owner and/or operator of Today.com, for violating the VPPA by disclosing its digital subscribers' identities and Video Media they have watched to Facebook without obtaining their digital subscribers' "written consent" "in a form distinct and separate from any other form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(B).

2.    Digital subscribers of the Today.com are "consumers" under the VPPA.

3.    The VPPA prohibits "video tape service providers," such as Today.com, from knowingly disclosing consumers' personally identifiable information ("PII"), including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without express consent in a "distinct and separate" form that "is given at the time the disclosure is sought" or "is given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner[.]" 18 U.S.C. § 2710(b)(2)(B)(ii)(I)-(II).

4.    During time periods relevant to this matter, Defendant has collected and shared the personally identifying information of visitors to its website and mobile application ("App") with third parties.

5.    Defendant does this through tracking cookies, software development kits ("SDK"), and tracking pixels.

6.    In other words, digital subscribers to Today.com have their personally identifying information disclosed to Defendant's third-party business partners.

7.     Notably, Defendant knows that users "subscribe" to its daily digital newsletters, understands and benefits from convincing users to become "subscribers," and financially profits from its digital subscribers in numerous ways.

8.     The Facebook pixel is a functional software code Defendant has chosen to install on Today.com allowing it to collect users' data. More specifically, the Facebook pixel tracks when digital subscribers enter Today.com or Today.com's accompanying App and view Video Media. Importantly, Facebook is able to track which users subscribe to the digital newsletter, when those subscribers visit video content on Defendant's website, and what video content digital subscribers visit via the daily digital newsletters. This is accomplished by appending a CID tag (campaign ID) to the URL for the video that clearly identifies that the subscriber clicked on the video link in the newsletter, which newsletter, and the date of that newsletter. For example, the URL for a particular video accessed by a random visitor to the Today.com website appears in the following format:

🔒  https://www.today.com/popculture/joe-jonas-sophie-turner-divorce-rcna103286

9.     By comparison, when a subscriber clicks the video from an embedded link in the "This is Today" daily digital newsletter Defendant appends "?cid=eml_thisistodayYYYYMMDD" to the URL so newsletter engagement from known users can be tracked and shared:

🔒  today.com/popculture/joe-jonas-sophie-turner-divorce-rcna103286?cid=eml_thisistoday_20230906

10.     Additionally, Defendant's website and tracking technology utilized on the website monitor when a digital daily newsletter subscriber "converts" from the newsletter to the website.

11.     Even though this case was filed in 2022, Today.com, as of the time of this filing still tracks and discloses to Facebook the digital subscribers' viewed Video Media, and most notably, the digital subscribers' FID which provides any reasonable person access to a person's

Facebook (and Instagram) page and/or account which in turn provides that person with access to information such as the person's name, location of residence, work history, educational history, date of birth, photographs of the user that include metadata sufficient to demonstrate location, gender, and likes. This occurs even when the digital subscriber has not shared (nor consented to share) such information.

12.     Importantly, Defendant packages personally identifiable information and video viewing information together and shares this Personal Viewing Information – *i.e.*, digital subscribers' unique FID and video content viewed – together in a single transmission as one data point with Facebook. Because the digital subscriber's FID uniquely identifies an individual's Facebook user account, Facebook—or any other ordinary person—can use it to quickly and easily locate, access, and view digital subscribers' corresponding Facebook profile. Put simply, the pixel allows Facebook to know what Video Media one of its users viewed on Today.com.

13.     Thus, without telling or obtaining the express consent of its digital subscribers in a "distinct and separate form" or otherwise, Defendant profits handsomely from its unauthorized disclosure of its digital subscribers' Personal Viewing Information to Facebook. It does so at the expense of its digital subscribers' privacy and their statutory rights under the VPPA.

14.     Because Today.com digital subscribers are not properly informed about this dissemination of their Personal Viewing Information – indeed, it is automatic and invisible – they cannot exercise reasonable judgment to defend themselves against the highly personal ways Today.com has used and continues to use data it has about them to make money for itself at the expense of consumers.

15.     Defendant chose to disregard Plaintiff's and, upon information and belief, hundreds of thousands of other Today.com digital subscribers' statutorily protected privacy rights by

releasing their sensitive data to Facebook. Accordingly, Plaintiff brings this class action for legal and equitable remedies to redress Defendant's practices of intentionally disclosing its digital subscribers' Personal Viewing Information to Facebook in knowing and direct violation of the VPPA.

## JURISDICTION & VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

17.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

18.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District.

## THE PARTIES

19.     Plaintiff Sherhonda Golden is an adult citizen of the State of Missouri and is domiciled in the State of Missouri. Plaintiff began a digital subscription to Today.com in 2022 which continues to this day. Plaintiff has had a Facebook account from approximately 2012 to the present. During the relevant time period she has used her Today.com digital subscription to view Video Media through Today.com and/or App on Defendant's website. Plaintiff did so while logged into her Facebook account. By doing so, Plaintiff's Personal Viewing Information was disclosed

to Facebook pursuant to the systematic process described herein. Plaintiff never gave Defendant express written consent to disclose her Personal Viewing Information to unauthorized third parties.

20.    Defendant NBCUniversal Media, LLC is a Delaware limited liability company with its principal place of business located at 30 Rockefeller Plaza, New York, New York.

## FACTUAL ALLEGATIONS

### A.    Background of the Video Privacy Protection Act

21.    The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

22.    The impetus for the VPPA was President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

*Id.* at 5-6 (internal ellipses and brackets omitted).

23.    In 2012, Congress amended the VPPA, and in doing so, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow

consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

24.     The 2012 amendments clarified "that a video tape service provider may obtain a consumer's informed, written consent on an ongoing basis and that consent may be obtained through the Internet." Video Privacy Protection Act Amendments Act of 2012, Pub. L. 112-258, 126 Stat. 2414; *see also* 18 U.S.C. § 2710(b)(2)(B) (authorizing a video tape service provider to disclose consumers' personally identifiable information "to any person with the informed, written consent (including through an electronic means using the Internet) of the consumer" provided either "at the time the disclosure is sought" or "in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner").

25.     The consent, however, must be "in a *form distinct and separate* from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(a)(4) (emphasis added).

26.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

27.     The VPPA defines "consumer" as any "renter, purchase, or subscriber of goods of services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

28.     Under the VPPA, a consumer does not have to spend money for a good or service to be a "subscriber." *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 551 (2d Cir. 2024).

29.     The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

30.    By transmitting Facebook-specific identifiers (i.e., Facebook IDs) and video file names through Facebook's own embedded tool, the disclosing party, here, Defendant, expressly instructed Facebook as to the exact videos and other content the consumer accessed.

31.    The Facebook Pixel is one of the most, if not the most, commonly used, known, and easily understood tracking pixels.

32.    The Facebook Pixel is designed to allow any ordinary person (as long as we can presume an "ordinary person" can read), to read and understand the contents of information being shared with Facebook.

33.    Even though the information disclosed is technical in nature, any ordinary person can easily surmise what video content a person requested or obtained, as well as that person's FID, as it is an easily identifiable string of numbers.

34.    In other words, the disclosure was purposefully structured to be technical in nature – given the vast amount of data that entities including Defendant seek to disclose to Facebook.

35.    However, even though the disclosure is technical, it can be easily understood by ordinary people, as the general population understands how hyperlinks and URLs work.

36.    Further, it is generally understood that when marketing a product or service, knowing your target audience is a fundamental aspect.

37.    As such, it is generally understood that the Pixel would receive, decipher, and link data, including data protected by the VPPA, to an individual's Facebook Profile.

38.    Indeed, Facebook not only received this information in the precise form it was transmitted but also leveraged it to build detailed profiles for targeted advertising based on a consumer's video-watching habits.

39.    A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

40.    Under the VPPA, "[a]ny person aggrieved by any act of a person in violation of this section may bring a civil action in a United States district court." 18 U.S.C. § 2710(c)(1).

41.    Under the VPPA, "[t]he court may award—(A) actual damages but not less than liquidated damages in an amount of $2,500; (B) punitive damages; (C) reasonable attorneys' fees and other litigation costs reasonably incurred; and (D) such other preliminary and equitable relief as the court determines to be appropriate." 18 U.S.C. § 2710(c)(2).

### B.    Today.com's Digital Subscriptions

42.    Today.com provides its users the option sign up for a daily digital newsletter, which is delivered to an electronic mail (email) address provided by subscribers to Today.com. For example, on November 18, 2022, when this action commenced, a user to Today.com would have been greeted with the following encouragement to sign up for the newsletter:



*See* Internet Archive, Today.com, Nov. 18, 2022, 9:01:40 a.m., *available at* https://web.archive.org/web/20221118090140/https://www.today.com/ (last visited May 1, 2025)

43.     Importantly, Today.com understands that by entering an email address and clicking "SIGNUP," that user is becoming a subscriber. At least, an excerpt of the "This is Today" daily digital newsletter makes three references to the daily digital newsletter being a subscription:



(Screenshot of "This is Today" daily digital newsletter from September 6, 2023).

44.     As can be seen from the "This is Today" daily digital newsletter excerpted above, Today.com lets currents subscribers know that they can: (1) refer a friend to "**Subscribe here**" (hyperlinked to Today.com "This is Today" signup page); (2) manage their "**Subscriptions**;" and (3) "**Unsubscribe**" from their subscription to the Today.com "This is Today" digital newsletter.

45.     Today.com offers subscriptions to multiple daily digital newsletters, including This is TODAY, Start TODAY, Stuff We Love, TODAY On the Show, TODAY Food, TODAY Parents, Read With Jenna, Concert Series Alerts, Show Updates, Special Events & Offers:



*See* Today.com, Today Newsletters, *available at*

https://www.today.com/newsletters?search=newsletter (last visited May 1, 2025).

46.     Defendant offers multiple subscription offerings with the goal of building an ongoing relationship with its subscribers, like Plaintiff, by having direct access to and delivering content to each subscriber's inbox. Defendant also provides the daily digital newsletter to drive interactions with its own website and video content, which benefits Defendant by permitting it to know precisely who exactly is watching its videos and reading its stories through the use of the CID and Facebook Pixel (as opposed to a non-subscriber viewer) and then by sharing that information with Facebook.

47.     Today.com users provide their personal information, including but not limited to their name, email address, and zip code.

48.     NBCUniversal Media, LLC operates a website in the U.S. accessible from a desktop and mobile device at Today.com. It also offers an App available for download on Android and iPhone devices.

49.     All digital subscribers provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and physical location.

50.     Digital subscribers may provide Defendant the identifier on their mobile devices and/or cookies stored on their devices.

51.     Because of how Defendant configured its website and tracking technologies, digital subscribers also provided at least one device identification number, and, upon information and belief, a network identifier.

52.     When beginning a subscription, Defendant does not disclose to its digital subscribers that it will share Personal Viewing Information with third parties, such as Meta. Digital subscribers, during the relevant time period, did not consent to such information sharing.

53.     After becoming a digital subscriber, subscribers receive digital newsletters that contain hyperlinks to Defendant's web-hosted audio visual content, exclusive content, and direct, prominently featured links to audio visual content on Today.com. Clicking a hyperlink and viewing video content on Today.com from a daily digital newsletter allowed Defendant and third parties, including Facebook via the Facebook Pixel, to know what video content is being consumed, and that the content was accessed via a daily digital newsletter by a subscriber.

54.     Moreover, digital subscribers are not provided with any notification that their Personal Viewing Information is being shared.

55.     Similarly, Defendant also fails to obtain digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

56.     Defendant's active use of the CID parameter to distinguish newsletter-driven video views from generic site traffic underscores the subscriber relationship. By appending a unique campaign identifier tied to each individual's subscription account, Defendant deliberately captures and reports each subscriber's viewing activity back to its advertising partners.

**C.     Defendant Admits It Collects and Discloses Certain Personal Information of Digital Subscribers to Third Parties but Fails to Advise It Discloses Personal Viewing Information, as Required Under the VPPA.**

57.     The operative Privacy Policy for Today.com states that it collects "Personal Information" from its users:

"Connection and Usage

For example: domain names, browsing activity, scrolling and keystroke activity, advertisements viewed, forms or fields you complete or partially complete, search terms, whether you open an email, content you view and duration, quality of the service and interaction with the content, logs, and other similar information. If these events occur while you are offline, they may be logged and uploaded to us when you next connect."

*See* NBCUniversal Privacy Policy, *available at* https://www.nbcuniversal.com/privacy (last visited Feb. 15, 2023).[1]

58.     Today.com discloses in its Privacy Policy that it automatically collects "content you view and duration."[2]

59.     Importantly, nowhere in Today.com's Terms of Service or Privacy Policy is it disclosed that Defendant will share digital subscribers' private and protected Personal Viewing Information with third parties, including Facebook.

---

[1] Defendant updated its policy on December 16, 2022 during the pendency of this matter. NBCUniversal Privacy Policy, *available at* https://www.nbcuniversal.com/privacy (last visited May 1, 2025). The prior version of the policy are available on the Internet Archive ("Wayback Machine"). *See* Internet Archive, *available at* https://archive.org/ (last visited May 1, 2025).
[2] *See id*

**D.    How Today.com Disseminates Digital Subscribers' Personal Viewing Information**

**1.    Tracking Pixels**

60.    Approximately seven-in-ten U.S. citizens have a Facebook profile[3] – all of whom provided the same personal information to Meta when creating their Facebook profiles.

61.    Meta promotes its ability to allow businesses to target their ads to specific audiences using these types of identifying information[4] as well as information about actions specific users have taken on the businesses' websites.[5]

62.    Facebook introduced its Pixel tracking tool in 2013 to allow online businesses like Defendant to track the actions of their users, subscribers, and customers on their websites, and importantly, to build detailed, valuable profiles about their website users.[6] *See* Meta, *Meta Pixel*, *available at* https://developers.facebook.com/docs/meta-pixel/ (last visited May 1, 2025).

63.    Meta describes the Meta Pixel as "a snippet of JavaScript code that allows you to track visitor activity on your website. It works by loading a small library of functions which you can use whenever a site visitor takes an action (called an event) that you want to track (called a conversion). Tracked conversions appear in the Ads Manager where they can be used to measure the effectiveness of your ads, to define custom audiences for ad targeting, for Advantage+ catalog

---

[3] Schaeffer, Katherine, Pew Research Center, *5 Facts about how Americans use Facebook, two decades after its launch* (Feb. 2, 2024), *available at* https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-howamericans-use-facebook-two-decades-after-its-launch/ (last visited May 1, 2025).

[4] Meta Business Help Center, Age and gender, Meta, *available at* https://www.facebook.com/business/help/151999381652364 (last visited May 1, 2025); *see also* Meta Business Help Center, About specific targeting, Meta, *available at* https://www.facebook.com/business/help/121933141221852?id=176276233019487 (last visited May 1, 2025).

[5] Meta Business Help Center, Options to create a website custom audience, Meta, *available at* https://www.facebook.com/business/help/2539962959620307 (last visited May 1, 2025).

[6] Meta, Meta Pixel, *available at* https://developers.facebook.com/docs/meta-pixel/ (last visited May 1, 2025).

ads campaigns, and to analyze that effectiveness of your website's conversion funnels." *See* Meta, Meta Pixel, *available at* https://developers.facebook.com/docs/meta-pixel/ (last visited May 1, 2025).

64.     Once activated, the Meta Pixel "tracks the people and type of actions they take,"[7] including each page users' visit, what buttons they click, as well as specific information that users input into a website.[8]

65.     Meta explains that installing the Pixel allows them to "track Facebook ad-driven visitor activity on [their] website" and enables Facebook "to match . . . website visitors to their respective Facebook User accounts."[9]

66.     In its "Get Started" page, Meta explains "[b]y default, the Pixel will track URLs visited, domains visited, and the devices your visitors use."[10] In addition, website operators can also program their Pixel to track "conversions" (website visitor actions) which are sent to the Facebook Ads Manager and the Facebook Events Manager to be used to analyze the effectiveness of ad campaigns and to define custom audiences to adjust and create new campaigns[11]

67.     Meta's "Get Started" page further explains how it can identify website visitors and match them to their Facebook pages: "[The Meta Pixel] relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we

---

[7] Meta, Overview, *available at* https://www.facebook.com/business/goals/retargeting (last visited May 1, 2025).
[8] Meta, About Meta Pixel, *available at* https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited May 1, 2025).
[9] Meta, Get Started, *available at* https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 1, 2025).
[10] Meta for Developers, Get Started, Meta (2024), *available at* https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 1, 2025)
[11] Meta for Developers, Conversion Tracking, Meta (2024) *available at* https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited May 1, 2025)

can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns."

68.    Facebook maintains vast amounts of data on each of its users', like Plaintiff and the putative members of the Class.

69.    This data is not limited to only what a person does on Facebook but also includes all records relating to when a user is tracked on off-Facebook websites – such as Plaintiff's interactions with www.today.com.

70.    Facebook Pixels continuously add data from new interactions to the historical profiles Meta maintains on individuals with Facebook profiles.

71.    Each interaction sent to Meta via the Pixel (including interactions sent by www.today.com), is linked to all of the other personal information Meta possesses about the user, such that Defendant has access to and can leverage a user's personal data.

72.    In addition to the information every user is required to provide to Meta when creating an account (including First and Last name, date of birth, gender, email address and/or mobile number, and password), Meta also possesses and has access to all of the information every user has ever posted on his or her Facebook profile, profile views, likes, comments, shares and/or re-posts, event invitations, event R.S.V.P.'s, Facebook messages, "check-ins," and much, much more. Further, as explained above, Facebook maintains a record of each user's Off-Facebook Activity – all Facebook Pixel events that "fire" on non-Facebook websites, including www.today.com.

73.    Crucial to the Pixel's effectiveness is its ability to associate a user's interactions on websites across the internet with that specific user's unique Facebook profile. The Pixel's fundamental purpose is to continuously add data from new interactions to the historical profiles

Meta maintains on individuals with Facebook profiles (and even for a time after users delete their Facebook profiles).

74.    Each interaction sent to Meta via the Pixel is linked to all of the other personal information Meta possesses about the user, and this constant addition of data aids Meta – one of the worst data-privacy actors of this generation...if not ever – in targeting users.

75.    Thus, for each of Plaintiff's interactions on the Website, the Pixel transmitted those interactions to Meta, who was able to instantaneously associate that interaction with Plaintiff's personal information that he submitted when creating her account, and any personal information ever available on his Facebook profile.

76.    Facebook also creates "shadow profiles," of users and at least one court has recognized that a pixel's ability to track comprehensive browsing history is important. *See, e.g., Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1078-79 (N.D. Cal. 2021) (finding a reasonable expectation of privacy where Google combined the unique identifier of the user it collects from websites and Google Cookies that it collects across the internet on the same user).[12]

77.    Once a company or organization has installed the Meta Pixel on its website, the Pixel tracks users as they navigate through the website and logs a variety of information designated for tracking by the company, including pages visited, any website "buttons" they click, the specific information entered in forms (including personal information), as well as "optional values."[13]

---

[12] *See* Facebook Shadow Profiles (Feb. 2022), *available at* https://www.cesifo.org/DocDL/ cesifo1_wp9571.pdf (last visited May 1, 2025).
[13] Meta, Meta Pixel, *available at* https://developers.facebook.com/docs/meta-pixel/ (last visited May 1, 2025).

78.     Websites and apps use Facebook's pixel and SDK to collect information about user's devices and activities and send that to Facebook. Facebook then uses that information to show the user targeted ads.

79.     To obtain the code for the Pixel, the website advertiser tells Facebook which website events it wants to track (*e.g.*, Video Media) and Facebook returns corresponding Facebook pixel code for the advertiser to incorporate into its website.

80.     Defendant installed the Facebook tracking pixel, which enables it to disclose Plaintiff's and Class Members' Personal Viewing Information to Facebook, because it benefits financially from the advertising and information services that stem from use of the Pixel.

81.     When a Today.com digital subscriber enters the website and watches Video Media on the website, the website sends to Facebook information about the viewer, including, but not limited to, their identity and the media content the digital subscriber watched. Specifically, Today.com sends a single transmission to Facebook containing the video content name, the URL of the pre-recorded video that was viewed (which clearly identified the video content being watched) along with, most notably, the viewers' Facebook ID that uniquely identifies the user.

82.     To "implement the pixel" on its website, Defendant had to take several affirmative steps. For example, Facebook notes: "To install the Pixel, we highly recommend that you add its base code between the opening and closing <head> tags on every page where you will be tracking website visitor actions. Most developers add it to their website's persistent header, so it can be used on all pages." *See* Meta for Developers, *Get Started*, *Installing the Pixel*, *available at* https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 1, 2025) (formatting in original).

83.    Moreover, Facebook notes that "[d]evelopers and marketers can **optionally choose** to send additional information about the visit through Custom Data events." *See* Facebook, *Meta Pixel*, *available at* https://developers.facebook.com/docs/meta-pixel (last visited May 1, 2025). Thus, Defendant made a conscious decision to share its users' PII to Meta. This awareness is demonstrated by several factors, including: (a) the fundamental purpose and functionality of the Pixel, which is designed to collect data on user interactions with a website, (b) the widespread public information and media coverage regarding Meta's advertising practices, making these practices widely known, and (c) the resources and documentation provided by Meta on its website, where users like the Defendant can access information about the Pixel's capabilities and obtain the necessary code to implement it on their own websites.

84.    The Defendant's awareness of the Pixel is further demonstrated by the benefits it derived from the Pixel's functionality.

85.    By installing the Pixel, the Defendant was able to target digital advertising to its subscribers, as well as potential subscribers, based on the content those individuals had previously accessed or requested from the website, including prerecorded audiovisual materials.[14]

86.    Defendant specifically benefited from its installation of the Pixels because Defendant maintains a Facebook page (www.facebook.com/today) and advertises on Facebook, meaning its disclosure of users' interactions to Meta ensured its ads were shown to the right individuals on Facebook at exactly the right time.

---

[14] Meta for Developers, Conversion Tracking, Meta for Developers (2024), *available at* https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ / (last visited May 1, 2025).

87.     Defendant is the sole operator of the Website, and Defendant is solely responsible for the decisions it makes about what technology to include within its Website. Defendant made the affirmative decision to knowingly include the Meta Pixel on its website.

88.     Defendant knew and understood what the Pixel was, how it functioned, and what data it would collect and share with Meta because Defendant installed the Pixel on its site and configured its functionality.

### 2.     Facebook ID ("FID")

89.     An FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name with the execution of one simple command within an internet browser. In short, an FID is a link to the user's Facebook profile. When a Facebook user with one or more personally identifiable FID cookies on their browser views Video Media from Today.com on the website or app, Today.com, through its website code, causes the digital subscriber's identity and viewed Video Media to be transmitted to Facebook by the user's browser. This transmission is not the digital subscriber's decision, but results from Defendant's purposeful use of its Facebook tracking pixel by incorporation of that pixel and code into Today.com's website or App. Defendant could easily program the website and app so that this information is not automatically transmitted to Facebook when a subscriber views Video Media. However, it is not Defendant's financial interest to do so because it benefits financially by providing this highly sought-after information.

90.     Every Facebook account is assigned a unique User ID (the "c_user" field), which links directly to that account regardless of the name or pseudonym displayed. A User ID thus identifies one and only one profile, providing a more precise means of identification than a common personal name.

91.     Facebook itself publishes explanations and help-center materials confirming that a User ID is a string of numbers that connects to a specific profile and can be entered into the URL bar (e.g., "www.facebook.com/[UserID]") to navigate directly to that profile. Ordinary Internet users — roughly seven in ten  Americans – are among Facebook's user base and regularly encounter URLs and learn from Facebook's own "Help" pages how to find and use User IDs.[15]

92.     A simple online search for "how to find Facebook account with Facebook ID" immediately yields publicly available instructions, demonstrating that even non-technical users can, without specialized knowledge, discover and apply a User ID to locate a given Facebook profile.

93.     In modern internet use, average individuals see and click URLs dozens or hundreds of times per day across email, news articles, social media, and other web pages.

94.     Upon seeing a string beginning "http" or "www," an ordinary person understands that it can be entered into a browser to access the linked resource.

95.     When a URL embedding a Facebook User ID is disclosed — such as by a video service provider — any ordinary user who follows that link will be brought directly to the Facebook profile operating under that ID, thereby identifying the person who watched the video and revealing any public details displayed on that profile (e.g., photos, posts, "friends", location, occupation, partner/spouse, educational history, etc.).

96.     Even if a profile's displayed name is pseudonymous (e.g., "Anony Mous"), the underlying User ID still furnishes a clear hook by which third parties can associate specific viewing behavior with a single, uniquely identified human being.

---

[15] https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last visitied May 8, 2025)

97.    Thus, a Facebook User ID is not an obscure technical detail but a readily accessible identifier that ordinary people understand and use to connect personal names, profiles, and online activities.

98.    The FID disclosure enables direct linkage of an individual to particular content they have viewed, rendering any assertion of anonymity baseless.

99.    Furthermore, with the rise in General Artificial Intelligence agents such as ChatGPT, anyone with an internet connection can use tools to decipher strings of computer code.

100.    In other words, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL – all of which Defendant knowingly and readily provides to Facebook without any consent from the digital subscribers – any ordinary person could learn the identity of the digital subscriber and the specific video or media content they requested on Today.com.

101.    At all relevant times, Defendant knew that the Facebook pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the functionality of the pixel, including that it enabled Today.com and accompanying app to show targeted advertising to its digital subscribers based on the products those digital subscribers had previously viewed on the website or app, including Video Media consumption, for which Defendant received financial remuneration.

E.    **Today.com Unlawfully Discloses Its Digital Subscribers' Personal Viewing Information to Facebook**

102.    Defendant maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the Video Media that each of its digital subscribers viewed.

103.    Defendant is not sharing anonymized, non-personally identifiable data with Facebook. To the contrary, the data it discloses is tied to unique identifiers that track specific Facebook users. Importantly, the recipient of the Personal Viewing Information – Facebook – receives the Personal Viewing Information as one data point. Defendant has thus monetized its database by disclosing its digital subscribers' Personal Viewing Information to Facebook in a manner allowing it to make a direct connection – without the consent of its digital subscribers and to the detriment of their legally protected privacy rights.

104.    Critically, the Personal Viewing Information Defendant discloses to Facebook allows Facebook to build from scratch or cross-reference and add to the data it already has in their own detailed profiles for its own users, adding to its trove of personally identifiable data.

105.    These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot that follows, a user visits Today.com and clicks on an article titled "The line in London to honor Queen Elizabeth is now miles long" and watches the video in the article.



*Pictured above: The article titled "The line in London to honor Queen Elizabeth is now miles long"*

*(taken from Today.com on or about September 15, 2022).*

106.    As demonstrated below, once the user clicks on and watches the video in the article, Today.com sends the content name of the URL, which identifies: (1) that there was a video on the page; (2) the video was "watched;" (3) an identifier for the video content; and (4) the subscriber's FID, to Facebook.



*HTTP single communication session sent from the device to Facebook, reveals the video name, URL and the viewer's FID (c_user field)*

107.    As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Facebook for its own personal gain the Personal Viewing Information of Defendant's digital subscribers, together with additional sensitive personal information.

108.    Defendant disclosed PII within the meaning of VPPA because the information transmitted to Facebook—including users' FIDs and specific video file names—was disclosed in a technical format, but one that is understood by ordinary people.

109.    The disclosing party here used Facebook's PageView code to transmit FIDs and video content identifiers directly to Facebook but did so in a manner that is easily decipherable (again, presuming that one can read).

110.    Defendant does not seek its digital subscribers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its customers remain unaware that their Personal Viewing Information and other sensitive data is being disclosed to Facebook.

111.    By disclosing its digital subscribers Personal Viewing Information to Facebook – which undeniably reveals their identity and the specific video materials they requested from Defendant's website – Defendant has intentionally and knowingly violated the VPPA.

**F.    Disclosing Personal Viewing Information is Not Necessary**

112.    Tracking pixels are not necessary for Defendant to operate Today.com's digital news publications and sign-up digital subscriptions. They are deployed on Defendant's website for the sole purpose of enriching Defendant and Facebook.

113.    Even if an on-line news publication found it useful to integrate Facebook tracking pixels, Defendant is not required to disclose Personal Viewing Information to Facebook. In any

event, if Defendant wanted to do so, it must first comply with the strict requirements of VPPA, which it failed to do.

### G.    Plaintiff's Experiences

114.    Plaintiff Sherhonda Golden has been a digital subscriber of Today.com from 2022 to the present. Plaintiff became a digital subscriber of Today.com by providing, among other information, email address and IP address (which informs Defendant as to the city and zip code she resides in as well as her physical location), and any cookies associated with her device. As part of her subscription, she receives emails and other communications from Today.com.

115.    These daily digital newsletters contain exclusive content and hyperlinks to Defendant's web-hosted audio-visual content. Plaintiff has accessed Defendant's audio-visual content via hyperlinks provided in the daily digital newsletters. Further, Defendant, via its disclosure of Personally Identifiable Information had her personal identity, her classification as a daily digital subscriber who is visiting Defendant's audio-visual content, and what content is being watched, provided information to Facebook unlawfully.

116.    Plaintiff has had a Facebook account since approximately 2012.

117.    When she created her Facebook profile, Plaintiff provided Meta with the required information to create her profile: her name, date of birth, gender, contact information, and password.

118.    From 2022 to the present, Plaintiff viewed Video Media via Today.com website and App.

119.    During the relevant period, Plaintiff's Facebook profile included publicly-available information specifically and uniquely identifying her, including but not limited to her full name, personal photographs that contain location and other information, and likes and follows of certain

commercial establishments in her hometown. Plaintiff's Facebook profile was accessible to any person in possession of her unique FID (which Facebook maintains for every user). Any person (or corporation) could use her FID to load Plaintiff's Facebook page directly and see this publicly-available information that specifically and uniquely identifies him.

120.    Additionally, Facebook, sitting in possession of Plaintiff's entire Facebook profile and account history, was in a special position. It could not only directly identify Plaintiff, but it could also access her entire historical Facebook dataset, including her visits to www.today.com and information disclosing that she had viewed specific video content.

121.    Plaintiff was a subscriber to www.today.com and is therefore a "consumer" under the VPPA.

122.    Plaintiff requested, obtained, and/or watched prerecorded audio-visual material on ww.today.com and through her digital subscription to Defendant's services.

123.    During the period when Plaintiff was a subscriber to the Defendant's services, she maintained a Facebook profile. Defendant knowingly shared her Facebook ID (FID) with Meta, along with the titles of the prerecorded audiovisual materials she accessed or requested (frankly, Defendant went one step further and denoted a "watch" in its URLs, which it shared with Facebook) and the URLs for those videos.

124.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to Facebook. Plaintiff has never been provided any written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of her Personal Viewing Information. Defendant nonetheless knowingly disclosed Plaintiff's Personal Viewing Information (her identity and the videos she watched) and PII to Facebook.

125.    Because Plaintiff is entitled by law to privacy in her Personal Viewing Information, Defendant's disclosure of her Personal Viewing Information deprived Plaintiff of the full set of benefits to which she is entitled. Plaintiff did not discover that Defendant disclosed her Personal Viewing Information to Facebook until August 2022.

126.    This unlawful disclosure is especially concerning given the bilateral nature of Plaintiff and Defendant's relationship. As the saying goes, "if you are not paying for the product, you are the product."

127.    Here, Plaintiff did not pay (in money, at least) for her daily digital subscription to Defendant's newsletter. Instead, Defendant had to pay to operate the daily digital newsletter, including at least transmission and exclusive content creation, and provided this service to Plaintiff for "free." However, an understanding of modern advertising makes clear that Defendant receives an ongoing benefit from Plaintiff. In return for being a subscriber, Defendant receives multiple benefits from Plaintiff. At least, Defendant gets the opportunity to direct Plaintiff back to its site (which benefits Defendant by allowing it to sell advertisements from advertisers to Plaintiff) and Defendant collects a treasure trove of information from digital subscribers when they visit the site, including knowing that the visitor came from a daily digital newsletter by tracking the CID, IP address, and other data valuable to Defendant and its paying advertisers.

**Class Action Allegations**

128.    Plaintiff brings this action individually and on behalf of all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons in the United States with a digital subscription to an online website owned and/or operated by Defendant that had their Personal Viewing Information [of pre-recorded videos] disclosed to Facebook by Defendant.

129.    Excluded from the Class are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families.

130.    <u>Numerosity</u>. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are hundreds of thousands, if not millions, of members of the Class widely dispersed throughout the United States. Class members can be identified from Defendant's records and non-party Meta's records. At a minimum, the combination of Defendant's email subscriber list with Meta's identification of users who have Off-Facebook Activity from www.today.com will identify members of the Class.

131.    <u>Typicality</u>. Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendant in that Defendant caused Personal Viewing Information to be disclosed to Facebook without obtaining express written consent. Her claims are based on the same legal theories as the claims of other Class members.

132.    <u>Adequacy</u>. Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

133.    <u>Commonality</u>. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable

conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the

Classes include:

     a. Whether Defendant knowingly disclosed Class members' Personal Viewing Information to Facebook;

     b. Whether the information disclosed to Facebook concerning Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

     c. Whether Defendant's disclosure of Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

     d. Whether Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B); and

     e. Whether the Class is entitled to damages as a result of Defendant's conduct.

134. <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action

### Tolling of the Statute of Limitations

135. All applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein. Plaintiff and Class members could not have reasonably discovered Defendant's practices of sharing their personal viewing content and PII with Meta until shortly before this class action litigation commenced.

136.     Defendant was and remains under a continuing duty to disclose to Plaintiff and Class members its practice of sharing personal viewing content and PII to Meta. As a result of the active concealment by Defendant, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CLAIMS FOR RELIEF

### Count I
### Violation of the Video Privacy Protection Act
### ("VPPA"), 18 U.S.C. § 2710

137.     Plaintiff incorporates the allegations contained in the preceding paragraphs by reference as if fully set forth herein.

138.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

139.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

140.     Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

141.     As defined in 18 U.S.C. § 2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

142.     Defendant knowingly, as it affirmatively programmed the Pixel into the code for Today.com, caused Personal Viewing Information, including FIDs, concerning Plaintiff and Class

members to be disclosed to Facebook. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to Facebook as an individual who viewed Today.com Video Media, including the specific video materials requested from the website.

143.    As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Defendant refers to Plaintiff and those similarly situated as "subscribers" multiple times in its digital daily newsletters, and Plaintiff is a subscriber based on her digital daily newsletter subscription because it provides Plaintiff exclusive content, direct (guided) access to Defendant's web-hosted video content, and is a quid pro quo relationship, as Defendant only provides the daily digital newsletters so that it can harvest Plaintiff's data and sell access to advertise to Plaintiff to Defendant's advertisers. Plaintiff is thus a "consumer" under the VPPA.

144.    As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent must be in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent under this definition.

145.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

146.    Defendant knew that these disclosures identified Plaintiff and Class members to Facebook. Defendant also knew that Plaintiff's and Class members' Personal Viewing Information was disclosed to Facebook because, inter alia, Defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscribers' FID.

147.    By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

148.    As a result of the above violations, Defendant is liable to the Plaintiff and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

### Count II

### Unjust Enrichment

149.    Plaintiff incorporates the allegations above by reference as if fully set forth herein.

150.    Defendant acted wrongfully by sharing Users' FIDs and viewing content to Meta without their consent.

151.    Defendant's practice of sharing Users' personal information and viewing content with Meta without their consent, and its failure to disclose this practice, caused Defendant to realize profits it otherwise would not have received, including from its improved ability to promote its content and services to its Users and its improved ability to sell advertising space on its website.

152.     Defendant's retention of these ill-gotten gains is unjust and inequitable.

153.     Plaintiff, on behalf of himself and the Class, accordingly, seeks restitution, restitutionary disgorgement, and all other appropriate relief permitted by the law of unjust enrichment, including reasonable attorneys' fees and costs. There is no adequate remedy at law that would provide redress to Plaintiff and the Class or ensure that Defendant will not deploy the same data practices in the future.

## **Relief Requested**

154.     Accordingly, Plaintiff, individually and on behalf of the proposed Class, respectfully requests that this court:

a.     Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) and declare Plaintiff as the representative of the Class and Plaintiff's Counsel as Class Counsel;

b.     For an order declaring that Defendant's conduct as described herein violates the federal VPPA, 18 U.S.C. § 2710(c)(2)(D);

c.     For Defendant to pay $2,500.00 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

d.     For punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

e.     For prejudgment interest on all amounts awarded;

f.     For an order of restitution and all other forms of equitable monetary relief;

g.     For injunctive relief as pleaded or as the Court may deem proper; and

h.     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

### **Jury Demand**

155.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury on all issues so triable.

Dated: May 9, 2025                             Respectfully Submitted:

                                   By:     */s/ Michael L. Murphy*
                                           Michael L. Murphy (NY 5084397)
                                           **BAILEY & GLASSER LLP**
                                           1055 Thomas Jefferson Street NW Suite 540
                                           Washington, DC 20007
                                           T: 202.494.3531
                                           mmurphy@baileyglasser.com

                                           Brandon M. Wise – IL Bar # 6319580*
                                           **PEIFFER WOLF CARR**
                                           **KANE CONWAY & WISE, LLP**
                                           One US Bank Plaza, Suite 1950
                                           St. Louis, MO 63101
                                           T: 314.833.4827
                                           bwise@peifferwolf.com

                                           * admitted *pro hac vice*