UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHERHONDA GOLDEN,<br>individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>NBCUNIVERSAL MEDIA, LLC,<br><br>      Defendant. | Case No. 1:22-cv-9858-PAE<br><br>ORAL ARGUMENT REQUESTED |

**NBCUNIVERSAL MEDIA'S MEMORANDUM OF LAW IN SUPPORT OF MOTION
TO DISMISS PLAINTIFF'S FOURTH AMENDED CLASS ACTION COMPLAINT**

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

I.      Today.com ..............................................................................................................2

II.     Plaintiff's Alleged Experiences ...........................................................................5

III.    Procedural History ..............................................................................................5

LEGAL STANDARDS ........................................................................................................6

ARGUMENT ......................................................................................................................7

I.      Plaintiff Fails to State a Claim Under the VPPA ..............................................7

        A.      Plaintiff does not allege that NBCU disclosed PII ...................................8

        B.      Plaintiff does not allege that an ordinary person could access the
                computer code transmission at issue ......................................................15

II.     Plaintiff's Unjust Enrichment Claim Is Duplicative of her VPPA Claim. ....................16

CONCLUSION ..................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................................6, 7

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)...................................................................................6

*Casey v. Odwalla, Inc.,*
  338 F. Supp. 3d 284 (S.D.N.Y. 2018)......................................................17

*Corsello v. Verizon New York, Inc.,*
  18 N.Y.3d 777 (2012) ..............................................................................16

*G-I Holdings, Inc. v. Baron & Budd,*
  179 F. Supp. 2d 233 (S.D.N.Y. 2001).....................................................17

*Goldemberg v. Johnson & Johnson Consumer Cos.,*
  8 F. Supp. 3d 467 (S.D.N.Y. 2014).................................................... 16-17

*Hu v. City of New York,*
  927 F.3d 81 (2d Cir. 2019).........................................................................7

*In re Hulu Priv. Litig.,*
  86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......................................................7

*In re Hulu Priv. Litig.,*
  No. C 11–03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ......15

*In re Nickelodeon Consumer Privacy Litigation,*
  827 F.3d 262 (3d Cir. 2016)....................................................10, 13, 15, 16

*Mahoney v. Endo Health Sols., Inc.,*
  2016 WL 3951185 (S.D.N.Y. July 20, 2016) ..........................................17

*Markatos v. Citibank, N.A.,*
  760 F. Supp. 3d 70 (S.D.N.Y. 2024)..........................................................4

*Niles v. Beverage Mktg. USA, Inc.,*
  No. CV19-1902 (SJF) (ARL), 2020 WL 4587753 (E.D.N.Y. Apr. 16, 2020) ........................17

*Salazar v. National Basketball Association,*
  118 F.4th 533 (2d Cir. 2024) ..................................................................5, 6

*Samuels v. Air Transp. Loc. 504,*
  992 F.2d 12 (2d Cir. 1993).........................................................................7

*Solomon v. Flipps Media, Inc.*,
   136 F.4th 41 (2d. Cir. 2025) ......................................................................................... *passim*

*Soto v. Disney Severance Pay Plan*,
   26 F.4th 114 (2d Cir. 2022) ...................................................................................................7

*Stewart v. Riviana Foods Inc.*,
   No. 16-CV-6157, 2017 WL 4045952 (S.D.N.Y. Sept. 11, 2017) .............................................4

*Wilson v. Triller, Inc.*,
   598 F. Supp. 3d 82 (S.D.N.Y. 2022) .....................................................................................15

*Yershov v. Gannett Satellite Info. Network, Inc.*,
   820 F.3d 482 (1st Cir. 2016) .................................................................................................16

**Statutes**

VPPA, 18 U.S.C. § 2710 ...............................................................................................1, 7

**Other Authorities**

Fed. R. Civ. P. 8(a)(2)....................................................................................................6

Fed. R. Civ. P. 12(b)(6)..............................................................................................4, 6, 7

# INTRODUCTION

Following many amendments to Plaintiff's complaint and several rounds of motion to dismiss briefing, this Court now has the benefit of dispositive guidance from the U.S. Court of Appeals for the Second Circuit in assessing the viability of Plaintiff's theory of liability under the Video Privacy Protection Act (18 U.S.C. § 2710, the "VPPA"). To state a colorable VPPA claim, a plaintiff must allege that a "video tape service provider" disclosed "personally identifiable information" ("PII"), meaning "information which identifies a person as having requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). In *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d. Cir. 2025), the Second Circuit made clear that, in order to constitute PII for purposes of the VPPA, the information disclosed must be information that an *ordinary person* could use to identify a specific individual and the video he or she requested or viewed. *Id.* at 52. As the Second Circuit explained, a disclosure that could only be understood by a sophisticated technology company does not constitute PII for purposes of the VPPA. *Id.*

Plaintiff's Fourth Amended Complaint (ECF No. 56, "4AC") does not meet this bar and her VPPA claim fails as a result. Indeed, the facts the 4AC alleges about the purported disclosures at issue are materially identical to those addressed by the Second Circuit. Accordingly—and exactly as the Second Circuit held when addressing these same facts—she does not and cannot plausibly allege that Defendant NBCUniversal Media, LLC ("NBCU") disclosed her identity or the titles of any video materials she viewed on Today.com in a manner that could be understood or even accessed by an ordinary person and, in turn, does not allege an actionable disclosure of PII. Moreover, because her unjust enrichment claim is tethered to her VPPA claim, it once again fails alongside it.

Plaintiff's theory of disclosure is substantively identical to that alleged by the plaintiff in *Solomon*, which the Second Circuit held did not state a PII disclosure under the VPPA. Plaintiff had the opportunity to plead why her case is any different but, instead, doubled down on the same allegations that the Second Circuit overtly rejected in *Solomon*. Accordingly, the Court should dismiss the Fourth Amended Complaint with prejudice.

## BACKGROUND

### I.    Today.com

Today.com is the website for TODAY, NBCU's popular televised morning news program. The main draw of the website is a livestream of TODAY programming that the public can tune into at any time. The site also includes a variety of articles, some of which include video that users can stream on demand. (*See* 4AC ¶ 105.) The site covers topics such as news, lifestyle, sports, and pop culture.

Like many websites, Today.com utilizes the Facebook Pixel, an online marketing tool using code provided by Facebook. (4AC ¶ 80.) Plaintiff's theory of disclosure is that Today.com visitors' video viewing activity, as well as their Facebook IDs ("FIDs"), are disclosed to Facebook as a result of the Facebook Pixel's presence on the site. (*Id.* ¶ 81.) Specifically, Plaintiff alleges that when a visitor watches a video on the Today.com website, a transmission of computer code—which she calls a "HTTP single communication session"—is sent to Facebook via the Facebook Pixel. (*Id.* ¶ 106.) She exhibits a *portion* of that transmission with a screenshot representing about a third of the total data allegedly sent (as evidenced by the scroll bar present on the right side of the screenshot)[1]:

---

[1] A partial screenshot of transmitted data was also used by the plaintiff in *Solomon*, which he described as a "PageView." *Solomon*, 136 F.4th at 54 n.14 (addressing the pleadings and observing that the plaintiff's screenshot of the allegedly transmitted data "shows only a portion of the PageView that the Pixel produces").

:authority: www.facebook.com

:method: GET

:path: /tr/?id=258438165004812&ev=Page%20View&dl=https%3A%2F%2Fwww.today.com%2Fvideo%2Fthe-line-to-pay-respects-to-queen-elizabeth-wrap
s-around-london-148494405810&rl=https%3A%2F%2Fwww.today.com%2F&if=false&ts=1663257978096&cd%5Burl%5O=https%3A%2F%2Fwww.today.com%2Fvid
eo%2Fthe-line-to-pay-respects-to-queen-elizabeth-wraps-around-london-148494405810&cd%5content_name%5D=Page%20View&sw=1280&sh=720&v=2.
9.81&r=stable&ec=0&o=30&fbp=fb.1.1663257877355.2010425085&it=1663257977353&coo=false&eid=bf3caf95-5e4e-463f-b00c-d114847b3466&rqm=GET&
dt=ap44nk4htacvejfklpr94hx79jrxgaed

:scheme: https

accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8

accept-encoding: gzip, deflate, br

accept-language: en-US,en;q=0.9

cookie: sb=5HftYmuKvY9744LJOIj0fsM8; datr=T3_tYn4t9lhm5ShZA4tHvGlR; c_user=100003190670927; dpr=1.5; xs=40%3ADRvBU-LlwPna1g%3A2%3A16620
66646%3A-1%3A2997%3A%3AAcXJvfy_fGr6B_A1g1__dAqvC9RXRM8opsbHAJttBkU; fr=0IQFkgt53TAn2Iz3s.AWX6muyZgZBx8fB6ciyIcmWGTPM.BjI00M.U8.AAA.0.
0.BjI00M.AWXqh6rFsPI

referer: https://www.today.com/

sec-ch-ua: "Google Chrome";v="105", "Not)A;Brand";v="8", "Chromium";v="105"

sec-ch-ua-mobile: ?0

(*Id.*)

The Fourth Amended Complaint focuses on two portions of the alleged HTTP single communication session: the information appearing after the "**path**" and "**cookie**" labels. *Id.* Plaintiff alleges that the "**path**" data "reveals the video name [and] URL" through the following text:

/tr/?id=258438165004812&ev=Page%20View&dl=https%3A%2F%2Fwww.today.com%2Fvideo%2Fthe-line-to-pay-respects-to-queen-elizabeth-wraps-around-london-148494405810&rl=https%3A%2F%2Fwww.today.com%2F&if=false&ts=1663257978096&cd%5Bur1%5D=https%3A%2F%2Fwww.today.com%2Fvideo%2Fthe-line-to-pay-respects-to-queen-elizabeth-wraps-around-london-148494405810&cd%5Bcontent_name%5D=Page%20View&sw=1280&sh=720&r=2.9.81&r=stable&ec=0&o=30&fbp=fb.1.1663257877355.2010425085&it=1663257977353&coo=false&eid=bf3caf95-5e4e-463f-b00c-d114847b3466&rqm=GET&dt=ap44nk4htacvejfklpr94hx79jrxgaed

And she alleges that the "**cookie**" data reveals "the viewer's FID:"

sb=5HftYmuKvY9744LJOIj0fWM8; datr=T3_tYn4t9lhm5ShZA4tHvGlR; c_user=100003190670927; dpr=1.5; xs=40%3ADRvBU-LlwPna1g%3A2%3A1662066646%3A-1%3A2997%3A%3AAcXJvfy_fGr6B_A1g1__dAqvC9RXRM8opsbHAJttBkU; fr=0IQFkgt53TAn2Iz3s.AWX6muyZgZBx8fB6ciyIcmWGTPM.BjI00M.U8.AAA.0.0.BjI00M.AWXqh6rFsPI

(*Id.*) Plaintiff admits that this information is disclosed in a "technical format," but alleges that "ordinary people" can decipher it if they "can read." (*Id.* ¶¶ 108–09.) She also alleges that

3

Facebook publishes "explanations" and "materials" that explain what a Facebook ID is, how it can be traced to a specific Facebook user, and posits that 70% of Americans have "learn[ed] from" this Facebook documentation. (*Id.* ¶ 91.) The resource she relies on, however, only provides information about the total number of Americans that are Facebook users; not the number of Facebook users who examine Facebook's technical documentation. (Ex. A to Declaration of Benjamin S. Thomassen ("Thomassen Decl.")[2].) And Plaintiff does not allege that any of this documentation teaches Facebook users how to decipher any part of the "technical" computer code contained in the "HTTP single communication session" alleged in the Fourth Amended Complaint. Nor does she allege that any of these materials explains that the term "c_user" refers to a Facebook ID, or that Facebook users should look for it in the data contained within a Facebook cookie.

Plaintiff also makes no allegations that someone other than Facebook could even access the transmission of computer code described in the 4AC. Plaintiff alleges that the transmissions are the result of "tracking cookies, software development kits ('SDK'), and tracking pixels," (4AC ¶ 5), and elsewhere explains that the Meta Pixel "relies on Facebook cookies" for the disclosures she alleges, (*id.* ¶ 67). But nowhere does Plaintiff allege whether any of these transmissions or cookie data is accessible to anyone other than Facebook—i.e., the entity who wrote the Facebook cookie underlying the disclosures she alleges (because they are not). Put

_____

[2] Because Plaintiff cites to and relies on the Pew Research Center article attached to the Thomassen Decl., (4AC ¶ 60, n.3), the Court may consider it in connection with this motion to dismiss. *Markatos v. Citibank, N.A.*, 760 F. Supp. 3d 70, 74 (S.D.N.Y. 2024) (quoting *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) ("Generally, a court may incorporate documents referenced [and consider them on a Rule 12(b)(6) motion] where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed.")).

another way, the 4AC does not plausibly allege an "ordinary person" could even see the data contained within the "HTTP single communication session." (*Id.* ¶¶ 108, 106.)

## II.     Plaintiff's Alleged Experiences

In support of her own VPPA claim, Plaintiff says that she began a digital subscription to Today.com at some point in 2022. (4AC ¶ 114.) Plaintiff also alleges she has had a Facebook account since 2012. (*Id.* ¶ 116.) She says that she "viewed Video Media via Today.com website and App," (*id.* ¶ 118), but does not specify the URL of any webpages she visited or specifically identify any video content appearing on such pages. She also does not allege that her internet browser had Facebook cookies—i.e., ones containing her own personal FID—on it at the time she supposedly "requested, obtained, and/or watch prerecorded audio-visual material on www.today.com." (*Id.* ¶ 122.) Still, she alleges that NBCU "disclosed [her PII] to Facebook." (*Id.* ¶ 125.)

## III.    Procedural History

Plaintiff initiated this case in November 2022. (ECF No. 1.) On August 23, 2023, the Court granted NBCU's Motion to Dismiss the First Amended Complaint, granting Plaintiff leave to amend. (ECF No. 34.) Plaintiff subsequently filed her Second and Third Amended Complaints, (ECF Nos. 35, 38), and the Court granted NBCU's Motion to Dismiss the Third Amended Complaint on September 11, 2024, on the grounds that Plaintiff's receipt of a non-video, email newsletter from the Today.com website did not make her a "consumer" within the meaning of the VPPA, (ECF No. 44). Plaintiff then appealed that dismissal order to the U.S. Court of Appeals for the Second Circuit. (ECF No. 46.)

While her appeal was pending, the Second Circuit issued a ruling in another VPPA case, *Salazar v. National Basketball Association*, 118 F.4th 533 (2d Cir. 2024), addressing the "consumer" issue that this Court found dispositive in its dismissal order. In that matter, the

Second Circuit held that the VPPA's definition of "consumer" encompassed individuals who—like Plaintiff—subscribed to a videotape service provider's non-video services. *Compare id.* at 551–52 *with* Opinion and Order (ECF No. 44) at 8–13. On this basis, the Court issued an indicative ruling, stating that it would deny NBCU's Motion to Dismiss the Third Amended Complaint if this case was remanded by the Second Circuit. (ECF No. 51.) Plaintiff then moved to remand her case to the this Court, which the Court of Appeals granted. (ECF No. 52.)

On April 17, 2025, the Parties filed a joint letter motion proposing a briefing schedule for Plaintiff to file another amended complaint and for NBCU to respond to the same, which the Court adopted in an Order issued that same day. (ECF Nos. 54, 55.) On May 1, 2025, the Second Circuit issued a ruling in *Solomon*, clarifying the standard for what constitutes "personally identifiable information" within the meaning of the VPPA. 136 F.4th at 52. Plaintiff filed her Fourth Amended Complaint on May 9, 2025. (ECF No. 56.)

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* The rule that a court accept as true allegations in a complaint is "inapplicable to legal conclusions," *id.*, and "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "Determining whether a complaint states a plausible claim for relief" is "a context-

specific task" that requires a court "to draw on its judicial experience and common sense." *Id.* "In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'" *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993)). A court "must dismiss a claim if a plaintiff pleads himself out of court by alleging facts which show that he has no claim." *Soto v. Disney Severance Pay Plan*, 26 F.4th 114, 120 (2d Cir. 2022) (cleaned up).

## ARGUMENT

### I. Plaintiff Fails to State a Claim Under the VPPA

The Second Circuit's *Solomon* decision flatly forecloses Plaintiff's VPPA claim. Plaintiff's theory of how "PII" was disclosed by NBCU is precisely the same as what the plaintiff alleged in *Solomon*: both allege that their FIDs and video-viewing information were sent to Facebook via a lengthy and "technical" transmission of computer code, without any explanation about how an "ordinary person" could parse through or even access the data relevant to their VPPA claims. The Second Circuit held those allegations could not support a VPPA claim. This Court should reach the same holding here.

To state a VPPA claim, Plaintiff must show that NBCU disclosed PII, defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. §§ 2710(b)(1), (a)(3). Under this definition, PII has "three distinct elements": "the consumer's identity; the video material's identity; and the connection between them." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) (emphasizing that "[t]he point of the VPPA . . . is not so much to ban the disclosure of user or video data; it is to ban the disclosure of information connecting a certain user to certain videos"). Here, Plaintiff does not plausibly allege a disclosure of PII because (i)

she does not allege the disclosure of information that an ordinary person would understand as identifying or revealing the "specific video materials" she accessed and (ii) she does not allege any facts plausibly supporting that the information disclosed could be accessed by an ordinary person in the first instance.

### A. Plaintiff does not allege that NBCU disclosed PII.

Plaintiff's theory of how NBCU purportedly discloses "PII" fails for the same reasons addressed in *Solomon*: an ordinary person would not be able to parse through the HTTP single communication session alleged in the Fourth Amended Complaint with "little to no effort" and identify (i) her FID (and link it to her) or (ii) the title of the video she watched. Because the disclosed data cannot readily identify *her* or the *specific video materials* she accessed, her VPPA claim fails.

In *Solomon*, the Second Circuit identified as the principal question on appeal as "what constitutes [PII] for purposes of the VPPA." 136 F.4th at 47. After noting that the VPPA does not specifically define the term, the court examined two standards used by other circuits—the "reasonable foreseeability standard," used by the First Circuit, and the "ordinary person standard," used by the Third and Ninth Circuits. *Id.* at 48–51. The court adopted the "ordinary person standard," which means that in order to be PII, the information disclosed must identify the specific individual and the video he or she viewed to an ordinary person "with little or no extra effort," rather than to the recipient of the information or someone capable of sophisticated data analysis. *Id.* at 51–52, 54. The court found this standard most consistent with the words of the VPPA, the context in which those words were used, and the purpose of the VPPA. *Id.* at 52 (PII is "not information that only a sophisticated technology company could use" to identify a consumer's video-watching habits).

The Second Circuit then applied the ordinary person standard to the plaintiff's allegations. The *Solomon* plaintiff's theory of PII relied on two categories of information allegedly shared with Facebook—FID and video title—which the plaintiff alleged were transmitted via "computer code" that the defendant shared with Facebook. The *Solomon* plaintiff demonstrated that transmission with a screenshot:



*Id.* at 46, 47. Neither the highlighting nor the outlined and labeled boxes appeared in the original version of the data transmission; rather, they were added for illustrative purposes in the *Solomon* litigation. In Box B, near the bottom of the screen, "the phrase 'c_user=' is followed on the next line by a partially redacted string of numbers—the user's FID." *Id.* at 46. As to the video title, the plaintiff asserted that the "underlined code following the word GET (also known as a GET request) in Box A is generated when a hypothetical user requests a certain video on [the defendant-appellee's website]," and "[w]ithin the GET request in Box A, the string of characters includes the specific title of the video that the user accesses." *Id.* The highlighted text showing the URL of a video includes both the word "watch" and the name of a video, "The Roast of Ric

Flair." As the image demonstrates, those words are visible within the computer code but are positioned amongst numerous other letters, numbers, and symbols.

Applying the ordinary person standard, the Second Circuit held that the data transmission alleged by the plaintiff "would [not], with little or no extra effort, permit an ordinary recipient to identify [plaintiff's] video-watching habits." *Id.* at 54. As to the whether the FID identified the plaintiff, the Second Circuit made two observations. First, it held it was "not plausible" under the facts alleged that an ordinary person would see the "c_user=" phrase within the larger data transmission and "conclude that the phrase was a person's FID." *Id.* As the court explained, because the FID numbers were nestled within the broader block of "computer code," to an ordinary person "the FID would be just one phrase embedded in many other lines of code." *Id.* Second, citing the Third Circuit's discussion of IP addresses in *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 283 (3d Cir. 2016), it held that the plaintiff's allegations that "entering 'facebook.com/[Solomon's FID]' into any web browser would result in Solomon's personal Facebook profile" did not sufficiently allege "*how* an ordinary person would use an FID to identify Solomon." *Id.* at 54–55 (emphasis in original). In doing so, the court rejected plaintiff's allegation that "[t]his basic method of accessing a person's Facebook profile is generally and widely known among the public." *Id.* at 55. As to video titles, the Second Circuit likewise found it "implausible" that an ordinary person would look at the multiple lines of code of the Facebook Pixel transmission and understand a portion of it—which referenced the URL of the webpage plaintiff accessed—identified a video title. *Id.* at 54.

*Solomon* confirms that Plaintiff does not allege the disclosure of statutory PII. **First,** Plaintiff does not allege her "c_user" number is identifying under *Solomon*'s ordinary person standard. Here, Plaintiff alleges that her identity is disclosed via her FID, which is contained

within the HTTP single communication session shown in ¶ 106. In her included screenshot, the word "cookie" appears partway down, followed by three dense lines of letters, numbers, and symbols. Within that data is the sequence "c_user=100003190670927," which Plaintiff alleges is a FID.



(4AC ¶ 106 (red box added for emphasis).)

These allegations are materially identical to the allegations at issue in *Solomon* and, as the Second Circuit explained, fail to allege a disclosure of identifying information for the purposes of the VPPA. In both cases, the portion of the code containing the Facebook ID: (i) is in a multiple line string starting with the word "cookie," (ii) includes numerous other data elements both before and after the "c_user" value (including the "datr" and "sb" elements before the "c_user" value, and the "xs" and "fr" elements appearing after it), and (iii) does not include the word "Facebook" in the line of code where the "c_user" number is presented. *Compare id.* with *Solomon*, 136 F.4th at 46, 54–55. And in both cases, the screenshot of the transmission at issue (i.e., the "PageView" discussed in *Solomon* and the HTTP single communication session in the 4AC) is "only a portion" of the overall data transmission. *Id.* at 54, n.14. Accordingly, the takeaway from *Solomon* applies with equal force here: "it is not plausible that an ordinary person

. . . would see the 'c_user' phrase [in the HTTP single communication session] and conclude that the phrase was a person's FID." *Solomon*, 136 F.4th at 54.

None of the Fourth Amended Complaint's other allegations address this core shortcoming. The 4AC references "explanations and help-center materials" published by Facebook "confirming that a User ID is a string of numbers that connects to a specific profile and can be entered into the URL bar (e.g., 'www.facebook.com/[UserID]') to navigate directly to that profile." (4AC ¶ 91.) It then asserts that "[a] simple online search for 'how to find Facebook account with Facebook ID' immediately yields publicly available instructions, demonstrating that even non-technical users can, without specialized knowledge, discover and apply a User ID to locate a given Facebook profile." (*Id.* ¶ 92.) But these allegations offer no explanation as to how an ordinary person would know that the "c_user" value in the HTTP single communication session represents a FID or is even associated with Facebook in the first instance, such that they would know to search the Facebook "explanations and help-center materials" or conduct the "simple online searches" that Plaintiff alludes to.

The Fourth Amended Complaint next alleges that average internet users understand what hyperlinks are and are capable of clicking on "URL[s] embedding a Facebook User ID" to reach a specific Facebook profile. (*Id.* ¶ 93–95.) But these allegations are of no help either because the reference to the "c_user" value in the alleged HTTP single communication session does not appear in a hyperlink, so there is nothing to click on and, in turn, no Facebook profile for an ordinary person to find "with little or no effort."

Finally, Plaintiff suggests that "anyone with an internet connection" can use "General Artificial Intelligence agents . . . to decipher strings of computer code." (*Id.* ¶ 99.) Putting aside that Plaintiff provides no allegations at all about how these tools would "decipher" the

transmission at issue here or how a user could command a "General Artificial Intelligence agent" to do so, Plaintiff provides no allegation why the mere *availability* of a tool means that people know it exists, use it, or know how to use it. To be sure, there are unquestionably reference materials available through the internet that "anyone with an internet connection" can access that likely explain what "c_user"—or even an IP address or any type of computer code—refers to, but that does not mean an ordinary person would even know to look. *See Solomon*, 136 F.4th at 55 (quoting *In re Nickelodeon*, 827 F.3d at 283 ("To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person.")).

**Second,** like the plaintiff in *Solomon*, Plaintiff does not allege that an ordinary person would be able to identify the video content she watched. Plaintiff alleges that the titles of videos she has watched on Today.com are disclosed via the URLs of webpages containing videos, which are transmitted to Facebook amongst the string of code shown in ¶ 106. Specifically, she alleges that as Today.com users click on "articles," they are taken to webpages that can include the word "video" in the page URL. (4AC ¶ 105.) She then alleges that the URL for these webpages are transmitted from a user's browser to Facebook:



(*Id.* ¶ 106 (arrow added to highlight page URL data).)

*Solomon* is again dispositive. There, the Second Circuit held that when "[t]he words of the title . . . are interspersed with many characters, numbers, and letters" within a data transmission, an ordinary person would not plausibly understand such text to be a video title. *Solomon*, 136 F.4th at 54. That applies to the transmission at issue here as well: as the Second Circuit explained, an ordinary person would not plausibly understand that these specific words within the multiple lines of code shown in the screenshot found in paragraph 106 represent a video title that Plaintiff had requested or viewed. To the contrary, the words comprising the video title are interspersed with other symbols, numbers, and letters, and surrounded on either end by various other content. (4AC ¶ 106.) Moreover, while Plaintiff tries to distinguish the facts at issue here as particularly identifiable because they may "denote[] a 'watch' in [the] URLs," (*id.* ¶ 123), that same "watch" denotation was identically included in "computer code" transmission at issue in *Solomon*. *See* 136 F.th at 46. Thus, and as in *Solomon*, Plaintiff does not demonstrate any facts plausibly supporting that an ordinary person could identify specific video materials she viewed or requested "with little or no effort."

In sum, Plaintiff alleges that "the pixel allows *Facebook* to know what Video Media one of its users viewed on Today.com." (4AC ¶ 12 (emphasis added).) But under *Solomon*'s "ordinary person" test, whether PII was disclosed within the meaning of the VPPA depends on whether information that would allow an *ordinary person* to identify a consumer's video-watching habits, "not information that only a sophisticated technology company could use to do so." 136 F.4th at 52. Because Plaintiff does not plausibly allege that NBCU disclosed either her FID or the video titles she watched in a manner that could be understood by an ordinary person, she fails to allege that NBCU disclosed her PII.

**B.**     **Plaintiff does not allege that an ordinary person could access the computer code transmission at issue.**

The Fourth Amended Complaint fails to allege the disclosure of statutory PII for a second reason: Even if an ordinary person could locate and interpret Plaintiff's FID and the title of video content she watched from the computer code transmission shown at ¶ 106, the Fourth Amended Complaint does not allege facts showing that an ordinary person could access such data in the first instance.

As the Second Circuit acknowledged in *Solomon*, the ability to access allegedly transmitted PII is an implicit requirement for any purportedly unlawful disclosure under the court's "ordinary person" analysis. *Solomon*, 136 F.4th at 54 ("Notably, the Complaint lacks any details about how an ordinary person might access the information on the Pixel's PageView."). Plaintiff does not allege such access here.

Plaintiff's theory of PII disclosure is premised on the transmission of information "by [her] browser" to Facebook using "personally identifiable FID cookies" stored on her device. (4AC ¶ 89; *see also id.* ¶ 67 ("The Meta Pixel relies on Facebook cookies") (cleaned up).) But those cookies are not "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 91 (S.D.N.Y. 2022) (citing *In re Nickelodeon*, 827 F.3d at 290). A cookie is accessible only to the specific website that wrote the cookie: "The only servers that can access a particular cookie are those associated with the domain that wrote the cookie. That means that [a defendant] can read only [its own] cookies, and it cannot read . . . facebook.com cookies." *In re Hulu Priv. Litig.*, No. C 11–03764 LB, 2014 WL 1724344, at *4 (N.D. Cal. Apr. 28, 2014) (internal citation omitted). Like all cookies, Facebook's cookies can only be read by the user and by the server that placed the cookies—Facebook.

Taking the allegations as pleaded, the key question under the ordinary person test is whether the Facebook cookies "would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Solomon*, 136 F.4th at 52 (quoting *In re Nickelodeon*, 827 F.3d at 267). That answer is a resounding "no," because no party other than Facebook is even able to read Facebook's cookies, much less extract information contained therein to identify a specific person. *Id.* ("[T]he definition [of PII] encompasses information that would permit an ordinary person to identify a specific individual's video-watching behavior, as opposed to information that only a technologically sophisticated third party could use to identify specific consumers."). Because the Second Circuit rejected the notion that the status of a disclosure depends on "what a *recipient* can or cannot reasonably do" with it, *id.* at 54 (citing *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016)), Plaintiff cannot base her VPPA claim on the disclosure of information that only the recipient of it—here, Facebook—can access.

## II. Plaintiff's Unjust Enrichment Claim Is Duplicative of her VPPA Claim

Finally, the Fourth Amended Complaint tacks on a claim for unjust enrichment, alleging that NBCU "acted wrongfully by sharing Users' FIDs and viewing content to Meta without their consent," and seeking restitution or disgorgement. (4AC ¶¶ 150–53.) The claim is duplicative of Plaintiff's VPPA claim and should be dismissed.

Under New York law, a claim for unjust enrichment "is available as a cause of action 'only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff.'" *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 483 (S.D.N.Y. 2014) (quoting *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012)). But such a claim is "not available where it simply duplicates, or replaces, a conventional

16

contract or tort claim." *Id.*; *accord Mahoney v. Endo Health Sols., Inc.*, No. 15CV9841(DLC), 2016 WL 3951185, at *11 (S.D.N.Y. July 20, 2016) (citation omitted) ("[U]njust enrichment is not a catchall cause of action . . . .").[3]

Here, the Fourth Amended Complaint alleges no new facts in support of Plaintiff's claim for unjust enrichment. Rather, it turns on the same allegedly tortious conduct—i.e., NBCU's purported disclosure of FIDs and URLs visited by website users to Facebook via the Facebook Pixel—that Plaintiff says violates the VPPA. (*See* 4AC ¶¶ 150–53.) Because "[t]hese facts are the exact same that form the basis of her [VPPA claim,] . . . [d]ismissal is proper." *Casey v. Odwalla, Inc.*, 338 F. Supp. 3d 284, 299 (S.D.N.Y. 2018).

## CONCLUSION

Plaintiff filed her Fourth Amended Complaint following the Second Circuit's issuance of its *Solomon* decision, meaning that she has already had the opportunity to allege facts sufficient to satisfy the "ordinary person" standard set forth therein. For the above reasons, she has not done so, and further amendment of her pleadings would be futile. The Fourth Amended Complaint should accordingly be dismissed with prejudice.

---

[3] There is no need for a conflict of law analysis because dismissal is warranted under either New York or Missouri law. "A federal court sitting in diversity applies the choice of law principles of the forum state to decide which state's substantive law controls. . . . [W]hen the forum state is New York, '[a] court is free to bypass the choice of law analysis and apply New York law in the absence of a material conflict.'" *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 249 (S.D.N.Y. 2001) (citations omitted). And here, "under New York and Missouri law, a plaintiff may plead unjust enrichment . . . only . . . when the defendant has not breached a contract nor committed a recognized tort." *Niles v. Beverage Mktg. USA, Inc.*, No. CV19-1902 (SJF) (ARL), 2020 WL 4587753, at *7 (E.D.N.Y. Apr. 16, 2020), *Report & Recommendation adopted*, 2020 WL 3445730 (E.D.N.Y. June 24, 2020).

Dated: June 5, 2025                    Respectfully submitted,

By: /s/ Benjamin S. Thomassen
    Jeffrey Landis
    ZWILLGEN PLLC
    1900 M Street NW, Suite 250
    Washington, DC 20036
    Telephone: (202) 296-3585
    Facsimile: (202) 706-5298
    jeff@zwillgen.com

    Benjamin S. Thomassen*
    ZWILLGEN PLLC
    One North LaSalle St. Suite 4600
    Chicago, IL 60602
    Main: (312) 685-2278
    Email: ben.thomassen@zwillgen.com

    *Admitted *pro hac vice*

    *Counsel for Defendant*
    NBCUNIVERSAL MEDIA, LLC

## <u>CERTIFICATE OF COMPLIANCE WITH WORD-COUNT LIMIT</u>

This document complies with the word-count limitation of Local Rule 7.1(c) because, excluding the parts of the document that are exempted, this document contains 5,052 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft 365) used to prepare the document.

   /s/ Benjamin S. Thomassen
Benjamin S. Thomassen